All right so everyone's here in the in the cases to be argued and I think all of us are ready to proceed so let's begin with the first motion in United States v. Johnson. May it please the court my name is Alexandra Shapiro and I represent appellant Mark Johnson. This appeal presents three substantial questions of law any one of which if resolved in Mr. Johnson's favor would result in reversal or a new trial. Given the limited time I'd like to focus on the first two questions and rely on our briefs for the third. The first question concerns the misappropriations doctrine which was developed in the very different context of insider trading. It only applies where there is a fiduciary or fiduciary like relationship and the question on appeal is whether the doctrine can be applied as a matter of law to foreign exchange trading conducted pursuant to a written contract between sophisticated counterparties which expressly disclaims any fiduciary relationship. It is indisputable in this case on this record that both Cairn and HSBC were sophisticated parties transacting at arm's length that it was Cairn that insisted the transaction should be governed by the written mandate letter which it incorporated the ISDA agreement. Cairn's advisor drafted the contract and it was reviewed and approved by Cairn's inside and outside counsel. The mandate letter expressly states that it shall be not not be regarded as creating any form of advisory or other relationship and that HSBC is not responsible for providing Cairn with specialist advice. It states in about three or four different ways expressly that there's no fiduciary relationship. It says each party understands the other party is not acting as a fiduciary or as an advisor. The agreements shall be regarded shall not be regarded as creating any form of advisory or other relationship. Each party is a principal and not the agent of the other and that Cairn has made its own independent decisions to enter into the transaction based on its own judgment as capable of assessing the merits of the transaction on its own behalf or through independent professional advice. Now how substantial for our purposes here, we're not going to decide that question, how substantial do we have to take it to be for your client to prevail on this motion? It's well settled under this court's decision in Rendell that the court merely has to find that it's a debatable question, one that could be decided either way. Appellant does not have to show that we're likely to prevail on appeal. And I also want to highlight that the district court itself essentially acknowledged that the appeal was substantial. He said that the appeal may be well advised to the Second Circuit and it may be . . . He called it a particularly knotty issue? He called it a knotty issue. He said you may prevail on appeal. So I submit it's not a close case as to whether it's a substantial question. I have a different question and that is, at sentence, did you ask for a sentence less than the two years sentence that was given? Yes. So that before sentence and after sentence there was a difference in that regard. What kind of sentence did the government ask for? The government asked for a seven year sentence. So the government asked for a seven year sentence. You asked for probation or something of that sort? Yes, Your Honor. Yeah. And then two years was given. Thank you. Correct. And the guidelines range was seven to nine. Yes. And can you talk a little bit about the circumstances? Your client has also, since a sentence has been imposed, he's traveled back to Britain on two occasions? Between the verdict and the sentence, he did. And each time he has executed a crime. And the district court, as we discuss in the papers, found after the verdict that, rejected the government's argument that he should not be permitted to travel back to Britain, and found that given his family ties, he has a wife and five young children, the fact that his home, which is his major asset, is encumbered, the government has a lien on it, that there was no realistic possibility of flight. I want to be very clear on this. These two journeys took place after conviction? Correct. And just before sentence? Correct. And each time, the sentence was postponed once or twice, and on both of the trips, one of the trips to return was for the actual sentence, and before that, there was another trip for sentencing, which later got returned for what was, at the time, the schedule of sentencing. Mr. Johnson had just sustained a very serious injury, which later was diagnosed as a torn ACL, and he nonetheless, the day after sustaining that injury, got on the plane and came back. There is really no dispute, no serious dispute here about risk of flight. Well, the government disputes it, and indeed, the government suggests some things which I will take up with them, because I am not at all pleased with some suggestions in the government's brief. But it isn't undisputed. They say expressly that he is a risk. I understand, Your Honor, but I also want to highlight for the Court that at sentencing, and this is at the sentencing transcript, page 74, the government admitted that the flight risk was the weaker of its arguments. Yes. Was the what? The weaker of its arguments. I see my time is up. Can I just state one more thing with respect to the risk of flight? I want to highlight that the Levin case cited in our papers, while the government tries to downplay it, that although that defendant was a U.S. citizen, actually the circumstances there, I would argue, created a greater risk of flight. The defendant was sentenced to 168 months. He had a Manhattan apartment that the government did not have a lien on that he could have sold. He no longer, at the time of sentencing, had any family ties to the New York area, and he also had a prior conviction, unlike Mr. Johnson. Thank you. Thank you, Your Honors. Good morning, and may it please the Court. My name is Lauren Albert, and I'm here on behalf of the United States. Judge Garifuz's decision to deny bail pending appeal was not clearly erroneous, because the defendant, Mark Johnson... Before you go any further, I want to tell you something that troubles me greatly. In your brief, on page 14, you suggest that the times that appellant has gone to Europe were before conviction. Read that paragraph, and anyone who hasn't looked into things gets that sense. Now, I must say very gently, I don't expect that from the government. I see it in people's briefs, but I expect the government to say things as they are. And when the government doesn't, it upsets me. It is also the 13th stroke of a crazy clock that is not only wrong in itself, but casts doubt on everything else. And I must tell you that when I read that, and read the other thing, it made any number of other assertions that you make in your brief about whether something is certain or not uncertain. So again, I'm old, you're young, don't do that. I understand, Your Honor. I certainly apologize to the extent that that was at all misleading. It certainly was not our intention. The defendant returned home to the United Kingdom both during the pretrial period and post-verdict pre-sentencing on several occasions, and there's no dispute about that history. So I apologize to the extent that that was described less than fully accurately in the brief. Turning first the defendant's risk of flight, as Your Honor just heard, the judge at sentencing found that the defendant did pose a risk of flight, and that finding is subject to review for clear error. Here the defendant cannot show that he does not pose a risk of flight. He has no residence, no ties, no status in the United States. He's a UK citizen, a UK resident. His family is in the UK, and under these circumstances, it would be difficult to see how Judge Garifas's finding of a risk of flight could be clearly erroneous. The defendant does have substantial means as well. I'm having a little difficulty, and help me understand where I may not understand the record, but I'm having a little difficulty in seeing how the district court did anything other than invoking the presumption. The presumption does go in your favor, but presumption policy, there are other factors here that make this case different from a lot of presumption cases, including the two trips back after conviction and the other circumstances in this case. It does, but I believe Judge Garifas at sentencing made the point that the sentence did not change. She acknowledged that in the past- Yeah, but in what way? I mean, I know that they asked for a probation sentence, but when he did that, he was convicted, and he was facing a sentence of seven to nine years under guidelines, and you were asking for a sentence of seven years, and he goes and comes back twice, so that while, yeah, often, I mean, there's a big difference, I agree, between pre-trial and after conviction in terms of this, but in this case, it's hard for me to see any real risk. I think that the change in circumstances is based upon the certainty of a pending sentence. The defense argued very strongly, very adamantly, that a non-custodial sentence was appropriate. I think they thought that that was a potential outcome at the time of sentencing, and then at the time of the sentencing, he learned that he faced the certainty- I really think he was surprised that he got some jail sentence of two years, which, you know, we see a lot of sentences. It ain't that long, and it's a lot of money to throw away. I can't speak for the defendant and whether he was surprised by the sentence, but I do think that his attorneys in good faith believed there was a custodial term. I have a question, Bo, on the merits of the thing, and that is, how much, assuming even that there was some fiduciary duty, the government seems to argue that the fiduciary duty runs to how they ran the trade, and that they somehow should have done it in the way that caused the least increase in the penalty. And that seems to run against all of these transactions. You know, if the argument of the government were narrowly that there was a fiduciary duty specifically not to do side trades, that would be one thing, but the government's argument here, and the government's theory, is broader, that when you enter into something of this sort, the party agrees to make the money by doing that. That would just mean none of these trades, because the whole point of a party entering into it is to make money by doing that. The side trades is another issue. See, I'm out of time, but if I can respond to Your Honor's question. I think the duty in this case, the fiduciary duty between Johnson, HSBC, and the client imposed upon them several obligations. The first was a duty of confidentiality, which was expressly undertaken by HSBC in the nondisclosure agreement, and which Mr. Johnson was aware of by virtue of his being on the other side of the information wall. That duty was violated when Mr. Johnson shared Cairn's confidential information with other traders at the bank. So yes, in order to execute the trade, the trader assigned to do the deal had to purchase pounds. That was part of it. That was going to maybe have an impact on the market. But the type of information disclosure that we're talking about is more akin to insider trading theory, where he shared that information with other people at the bank so that they could do proprietary trading on behalf of the bank, put themselves in the position to profit. Some of those pounds that were purchased through those front range trades were ultimately given to Cairn as part of the deal. Some of them were sold to the open market, and HSBC just took the profit out of it. That's the strongest part of your argument. That's the first duty. In addition, HSBC did undertake a duty, and Mr. Johnson himself represented to the client, that they would not ramp the fix, that they would not act in a way that was intentionally detrimental to the client's interest. And then Mr. Johnson and his co-conspirators went ahead to do just that, to intentionally try to raise the price as high as possible so that the bank could profit as much as possible by Cairn paying the highest price. And they succeeded. Their client paid the highest price for pounds of that entire day. Can you . . . . . . can you have another case in which there was a base agreement, but there is no fiduciary duty, and in which then later there is a non-confidentiality contract which says that that overcomes the original statement of no fiduciary duty. Is there another case where that has happened? I'm not aware of a case precisely on this. So you may well win, but it is a new issue in a way. I would submit that it's not a new issue under this Court's precedence in Chessmen, for example, where the standard for the duty necessary under the misappropriation theory isn't only like a formalistic contractual express, I am now your fiduciary, signed. No, you may well win. It can also be a functionally equivalent to a fiduciary duty. And our presentation to the jury was that there was enough evidence in our case to establish the functional equivalent. Obviously, in any case, there's going to be different facts that weigh in to the assessment of a duty. So I would argue this isn't a new legal territory. It's just another example of application of the same theory. Could you address the defendant's home in Britain and why the fact that that's a surety for the bond is not some guarantee, an additional guarantee that he will return? It certainly is something that we demanded to place a strong incentive on the defendant to return, but it's far from his only asset. The defendant has hundreds . . . Does he have children in the home? He does. He has a number of children and a wife at the home in England. He also, however, has hundreds of . . . What's the value of the home? I think it's around between one and a half and two million dollars equivalent, but I'm sure the defense counsel will correct me if I'm wrong. What do you understand his net worth to be? I understand his net worth to be around two million dollars, which includes . . . That was probation's finding leading up to the sentencing. Two million, is that what you said? Correct. Probation's finding leading up to the sentencing. Including the home? Correct. But I believe it also factored in the encumbrance on the home. He also has several hundred thousands of dollars of liquid assets, including cash and easily liquidated securities. Let me just ask back to the merits thing. Is it possible that the agreement of confidentiality is a valid contract that might give rise to contractual damages from the bank, HSBC, against him even, if he breached it, and yet not create a fiduciary duty, which gives rise then to the criminal penalty? In other words, could one read that agreement as a contractual agreement as to what happens if profits are less than expected, rather than a fiduciary duty in this criminal sense? Is that a possible reading? We would argue that the agreement in and of itself was sufficient to impose a fiduciary duty of confidentiality. I understand that you argued it, and I think it is certainly a possible argument, but we're here at the issue of bail, and so we're asking, is there any possible argument that has some plausibility that they can make? And so I wanted to explore that question of whether that intervening thing could be viewed as a contractual, rather than a change in fiduciary duty argument. Even if it could, Your Honor, the discourse precedents are clear that a duty is a question for a jury. And in this case, the confidentiality agreement was only one part of the evidence that was presented to the jury to conclude that there was, in fact, a duty. And so even if the court, on reviewing the sufficiency of the evidence, felt that the confidentiality agreement, for whatever reason, wasn't sufficient standing alone to create a duty necessary to impose criminal liability, it's only one piece of the puzzle. Thank you. Thank you very much. Thank you both.   Thank you. Thank you. Thank you.